My name is Katie Strong and I represent Cook Inletkeeper. I would like to try to reserve two minutes for rebuttal. I will first address why the Corps' decision to grant a wetlands permit for the project does not deserve deference and how the Corps erred by adopting the Railroad's flawed functional assessment. The Corps is not entitled to deference here because it relied on the Railroad's analysis without independent verification and because it failed to provide a reasoned response to the significant flaws highlighted by both EPA and Fish and Wildlife Service. This is a preliminary injunction appeal, right? Yes. So let's say you're right about that. Why isn't there a solution? Why does that support a preliminary injunction? Isn't this a kind of saying that if the Railroad estimate was wrong, they could just add more after-sale judgment that this report can add for the remediation measures? If I understand your question right, Your Honor, these issues go to the Inletkeeper's likelihood of success on the merits? Well, it goes to success on the merits and also what remedy you would get. Yes, Your Honor. Right. So what's the consequence of having it relied on the Railroad's? This is an assessment of whether they were doing enough to offset remediation, right? The functional assessment matters because it affects both compensatory mitigation and the question of whether... Compensatory mitigation. Yes, but it also affects whether the project complies with the 404b1 guidelines as to whether the project will cause significant degradation. And if the project will cause significant degradation, the court cannot issue a permit. And I thought, well, we kind of leapt over a couple of things, but the functional assessment issue I thought was the mitigation-ish question. How does it go to the other question? It goes to significant degradation because if you're destroying and impacting wetlands that are highly valuable, which is the case here, there is going to be more degradation than if you're impacting wetlands that are not as valuable. Isn't that a separate issue? I thought the compensatory mitigation was that they didn't... the amount of additional wetlands credits they had to buy was not enough, that they had done an analysis. So that would just go to buying more credits, right? It goes to that, but it also goes to whether the project will cause significant degradation. It goes to the level of harm the project is causing. Well, so then you have the separate argument, right, about that the court's analysis or response to the EPA and Fish and Wildlife Service's criticism was not adequate to show not significant degradation. Isn't that a separate issue? It's also a separate issue, Your Honor. They're all related. So... No, no, that's saying two different things. They're either separate issues or related. Well, the issues, Your Honor, they're all tied together. Well, compensatory mitigation is just about compensatory mitigation, right? I'm having trouble. I mean, unless you're trying to say that no amount of mitigation would be sufficient, which is not the argument that you made. You said they just calculated it wrong about what the value of the wetlands area was. Yes. And that doesn't help you in the preliminary injunction because if they're wrong about that, the district court can just say buy more. It has nothing to do with stopping them from going forward. So it doesn't help you at all in the preliminary injunction appeal. It does, Your Honor, because the wetlands are currently being destroyed. The government argument... No, but the compensatory mitigation argument, the argument that they didn't provide enough compensatory mitigation doesn't help you at all in the preliminary injunction appeal because if you won on that issue, all you would get is more compensatory mitigation. It would not stop the project. So there's no bearing on the preliminary injunction appeal. It would, though, Your Honor, because if they've not required adequate mitigation, then the project is not complying with the Clean Water Act, which affects the plaintiff's likelihood... But that's your final judgment, and the final judgment will be brought into compliance. If you're right on that, then it will be brought into compliance. It will be brought into compliance. They say, okay, go out and buy more mitigation. We'll buy more compensatory mitigation, and then it will be in compliance. We're here trying to project. We're trying to look down the road and see is this something that needs to be stopped because if you don't stop it now, the effect is going to be irreversible down the road, and buying more stuff is not something that's irreversible. You can always buy more stuff. You can always buy more stuff. However, you don't know how much stuff you need to buy unless you have an accurate assessment of what you're losing. And that's why you have a trial, and that's why you don't have further proceedings to figure that out exactly. But however much it is, in the end, it doesn't stop the project. In the end, it just says you buy more stuff. But currently, the wetlands are being destroyed, and you cannot assess the value of the destroyed wetlands after the fact because they're buried at that point. So going back and fixing it later is not a tenable solution. Won't you be able to tell the impact on the wetlands even better once you see what's happening with the culverts, et cetera, in place? Because it seemed like your main criticism was, or the EPA's main criticism was, well, you didn't do enough to quantify the degree of impacts outside of the footprint, and the Corps' response was, well, we have sufficiently minimized and avoided those impacts so that we can determine it's not significant. Yes, so two points. First, you cannot tell – it goes back to compensatory mitigation is also related to the direct fill. And so after you directly fill a high-quality wetland or a low-quality wetland, you can't determine the quality after it's been filled. So doesn't the regulation just say, well, in that case, one-to-one is the correct mitigation? It says the regulations say that one-to-one is the minimum. Here the Corps has required three-to-one for high-quality wetlands and one-to-one for the moderate-to-low-quality wetlands. Also, my second point to your question is that the harm to adjacent wetlands, the EPA and Fish and Wildlife Service have identified these wetlands as irreplaceable and of the variety that are hard, if not impossible, to replace or to restore within a human lifetime, which qualifies them as high-functioning wetlands. Where is that? That is at ER 524, which is the middle of the page, the paragraph starting the majority of the 101.8 acres. The government maintained in its brief that this was sort of an apples-and-oranges problem because different criteria were being applied and were applied at the environmental impact statements stage, so that when the EPA and the Fish and Wildlife Service say it's high-quality, they mean something else. The EPA and Fish and Wildlife Service were applying the Alaska Regional Guidance Letter, which is the same methodology that the railroad applied here. So this says it had some language about they're high-functioning because they're predominantly intact, undisturbed systems. And so the CORE's argument was, well, they were using a different standard and they laid it out in this matrix, which had a different definition for what the high-functioning was, that it was less common, and it had three factors, life support function, high-quality example of a rare wetland type, are rare within a given region, or are undisturbed and contain ecological attributes that are impossible or difficult to replace within a human lifetime. So that language, at least, is different than what was quoted in the response or in the EPA's criticisms. Both the railroad and the CORE explicitly acknowledge that they were relying on the Alaska Regional Guidance Letter, which is the same guidance letter that the EPA and Fish and Wildlife Service said that they were applying. The CORE acknowledges or lays out the definitions that EPA was applying. I believe that's at ER 277. And those definitions explicitly recognize it's the same language that EPA applied. The only different methodologies that were applied is that the FEIS did not use the Regional Guidance Letter. However, if you look at the attributes that the FEIS was analyzing, all those attributes, except for two functions that the railroad didn't include in the Clean Water Act analysis, all those attributes were included. So there's a lot of overlap between the two approaches. Could you tell us something about, in terms of our job at this point, what is the current state of things, if you know, or perhaps the government is the better entity to ask. But in two senses. First, what is the state of the construction or the filling in of the wetlands? And two, I gather this is a very short construction season. When is it over? I believe that they have started construction on segments one and six, and they anticipate those being done at the end of the next construction season, so 2014. And I don't believe the entire project is slated to be finished. It seems somewhat odd to me that the district court didn't go forward in the meantime with a summary judgment. I mean, ordinarily they do, and why that happened, I don't know. Or with a trial, whatever it is going to happen. So everything has been on hold, and we have a, is that right, in the district court? Yes. And we just have this preliminary injunction. But if we were to deny the preliminary, suppose we were to deny the preliminary injunction, is anything more going to happen in this construction season? In terms of this construction season, you'll have to ask my colleagues. Thank you. Good morning, Your Honors. May I please support John Smeltzer for the Corps of Engineers? Your Honors, I'm sharing time with counsel for the Intervenor Railroad. We agreed that I would take up to the first seven minutes. But with respect to your question, Judge Berzon, as to the status of the project, I think the best person in the courtroom to answer that question today is my colleague from the railroad. So I will leave that question for him. What I would like to do is discuss briefly some of the merits questions. And, of course, we submit the district court's decision to deny the preliminary injunction should be affirmed because the plaintiffs have not shown a likelihood of success on the issues they raise. The district court said awfully little about that and seemed to think that the earlier case was decisive, and I don't quite see why. Well, as to why the district court, you know, didn't elaborate, I mean, it's hard for me to speculate on that. I can't see how the reliance on the earlier NEPA case gets very far in this case. Right. But remember, the preliminary injunction, when it was brought in the district court, included the NEPA and the Clean Water Act claims. And the NEPA claims have been dropped now, but obviously the NEPA claims that were being raised at the preliminary injunction stage at the district court, this panel's previous ruling on the same FEIS were very highly relevant to those NEPA claims. And ultimately, the district court did go on and say, look, I've reviewed the entire record. I've looked at the standard. I've looked at these issues. These issues are within the technical expertise of the Corps of Engineers and deference is owed on these kinds of questions. And it's really that that we're supporting here. Specifically, then, on the mitigation issues, it seems the classifications, well, could you tell us why the classifications are not highly questionable? Because as I understand it, they took out two sets of criteria which would have been required under or are required under the Alaska scheme or under the analytics scheme they were using and said it's not applicable in Alaska, and I didn't understand that. Right. Well, to drop back, these aren't requirements of the Alaska guidance. I understand. This was the methodology that the railroad consultant chose to use, and that methodology has the applicant divide out wetland functions into eight categories and examine those functions. What the consultant said in this case was in looking at Alaska conditions and looking at the questions, the methodology that was designed under this McGee and Holland's methodology that they didn't fit Alaska conditions because there was no variation in relation to all of these various factors. And why does that matter? Well, ultimately, the idea here is to rank and judge wetlands. Oh, yes, but if they're all highly, I mean, if you're taking out the criteria that would make these category one because everybody has them, I mean, every wetland in Alaska has it, it seems to me you're putting an enormous sum on a scale, which is then going to, in other words, there isn't any reason why you have to make them into more different categories. If the wetlands in Alaska all are so valuable that they belong in category one, then that's where they belong. Your Honor, I don't believe that's the way the logic of the reason to exclude these went down. But ultimately, I'm not a wetland scientist either, so I can't answer that technical question. What I can say is it's a matter within the technical expertise of the Corps of Engineers. And I can also say... The problem, of course, here, which is where your opponent began, is that there's not a whole lot of evidence that the Corps of Engineers did a whole lot, other than delegate to the Alaska Railroad. And even with regard to the responses to the objections by EPA and Fish and Wildlife Services, they basically said, here's Alaska's letter and we agree with it, and that's all they said. Well, specifically on this point about the functional assessment, neither the EPA nor the Fish and Wildlife Service addressed that specific question your Honor raised either about the removal of these two functions in the final analysis. All right, but where should I look to see that EPA as opposed to Alaska Railroad? I mean that the Corps as opposed to Alaska Railroad actually said something explaining this. Well, what the Corps said in its record of decision was that there are a number of ways that this can be done and that they had reviewed the analysis in its entirety and determined that it was consistent with their guidance. But in no way did they address the question I asked. Those specific why those two functions were removed, no. In the record, that was addressed specifically by the engineers from the railroad. The best place where the entirety of the analysis is addressed in the record is at SCR, the Supplemental Excerpts of Record, pages 78 through 81. That's sort of the final information that was submitted by the railroad. When the Corps did push back on this, when EPA and the other agencies raised questions, in the record at SCR 114 and 118 there are meeting notes that say the Corps hadn't yet accepted the analysis. and wanted more information. And the citation I just gave you of SCR 78 through 81 was the final submission from the railroad. And then the railroad responded again at SCR 12. And then ultimately, based on that information, the Corps determined in its rod that the functional assessment was consistent. But let me just say quickly with respect to the functional assessment, I think Judge Kaczynski is correct that even if there's a problem with that issue, it's not a problem that would support a preliminary injunction here. And what Plaintiffs' Counsel said was that, look, once the wetlands are destroyed, you can't come back and do your functional assessment. But I think that ignores the record and the flaw that they raised, because the flaw isn't one in data collection. Those two functions, the data was collected for those two functions. All the data sheets were provided to the Corps. That information about the wetlands is in the record. The only dispute is about the interpretation of that information and the application of it with respect to translating the methodology to the classification that the Corps has. And, you know, that is something that can be done based on the available data. There were 167 field visits specific for this project, and there's been no allegation that that's insufficient. Your time is three minutes. Yes. Thank you very much, and I ask you to affirm this court's judgment. Good morning, Your Honors. Jay Johnson for the Alaska Railroad and the Madagascar-Sisseton Borough. I think there are several questions that are sort of on the table for me to address on behalf of my clients, so let me start with where the railroad construction is now. There are seven total construction segments, five of them, well, four of them are underway. The fifth has been bid out and is ready to be started in the next week or so, as I understand it. There are currently 165 people working on this project. When the next segment starts, that will go up to approximately 185. Obviously, this work is being conducted in accordance with the Service Transportation Board's licensing, which happened nearly two years ago, and with the Corps of Engineers permit, which is almost a year old. Quarterly reports are being submitted to the board. Everything is being done in accordance with all the permits and all the approvals that the railroad has received. And with regard to the construction season? The construction season, my understanding, I asked that question this morning, actually. There is work that can be done in wintertime, and, in fact, some work needs to be done in wintertime because the ground is frozen and allows equipment to travel with less damage to the environment, which, again, that's been a goal of the railroad throughout the project, to minimize damage. My understanding from talking with my clients this morning is that work will be less during the winter but not zero. There will still be work occurring, including bridge construction and other things like that that can be done, even in the coldest February and darkest times here. There was a question that was, you know, why aren't the wetlands classifications highly questionable? I don't think there's any debate that the classifications were done according to the Corps' guidance, you know, that one, two, three, everybody was trying to apply the guidance. I think the most important thing to understand is that the railroad was trying to avoid the most sensitive wetlands. They built a path that would not go through sensitive wetlands. And so when they sent their consultants into the field to take 242 different field observations over the course of the 2008 and the 2010 functional assessment surveys, all documented in, you know, I think approximately 700 pages of handwritten notes, when they did that, they looked at all the different functions. They checked off. You can look. This is all in the record. You can look and see, you know, the kind of work that they did. It was all submitted to the Corps. The Corps, as co-counsel just said, didn't take it all at face value by any stretch. There were meetings in June of 2011. That's at SER 118. In July of 2011 at SER 113 and 114, detailed responses. You know, during these meetings, the Corps is asking for more information. Alaska Railroad is providing it. And ultimately, as stated on the second page of the rod, the Corps said that they independently reviewed and evaluated all of the subsequent info and the FEIS, and they found them to be sufficient and accurate assessments. The FEIS was different, though. It wasn't the same. Well, the statement in the rod has to do with, of course, everything in the project. Specific to the functional assessment, the same methodology was used in the FEIS, which was based on the 2008 assessment, and the 404 process, which was based more on the combination of the 2010 and 2008 assessments. The same process was used to gather the fieldwork. The only difference is that in the 404 process, they calculated numbers for purposes of mitigation so they could go into whether it's categorized. But I thought the categorizations were completely different. They're different in the sense that they didn't happen in the FEIS stage, but they're based on the same type of information, the same wetland field data, plus the geographic information, GIS system data, which is a computer overlay. There were something like 10,000 different data points. Did the FEIS say essentially this was all high-functioning wetland, or most of it was? The FEIS says the area contains a lot of high-functioning wetlands, which it does. But not according to these numbers. You mean the ones that were not, in fact, being impacted? Is that what you're saying? Well, I think the FEIS says the Sasitna lowlands contains a great deal of high-functioning wetlands and wetlands that function at high capacity in different aspects. And you're saying that they meant the same thing by that term that was later used in the 2010 assessment, or they meant something different? I'm saying that they were referring to something more general. I understand that in terms of the area. Did they mean the same high-functioning? No, no. I think that they were referring sort of in general high-function as opposed to the course classifications, which are very specific and weren't calculated until the 2010 assessment, after the 2010 assessment in the Section 404 process. They were just speaking in sort of lay terms. I wouldn't say exactly lay terms, because it was the Service Transportation Board doing an environmental assessment, but not in the specific how much mitigation do we need to have for these particular impact terms, because that was something that was calculated during the Section 404 process. Okay. Thank you. If you have time, we'll give you a minute for rebuttal. Three points. First, the FEIS says that these particular wetlands in the project area, 90 to 100 percent of those wetlands are high-functioning for particular attributes. Second, the Corps says that all the data sheets were provided to it, but the record contains no data sheets for the wetlands categorized as put in the moderate to low category, so Category 3. And third, there is harm. There's no supporting evidence that the restoration of these wetlands will be possible, and this is the classic type of harm that warrants a preliminary injunction. Thank you. Thank you. In case you're still arguing, we'll stand for a minute. We're going to adjourn.
judges: Kozinski, Berzon, Ikuta